ARTILLIAS A. ANDERSON, PLAINTIFF IN ERROR, v. PENN-
    SYLVANIA RAILROAD COMPANY, DEFENDANT IN
    ERROR.

Submitted July 5, 1908—Decided November 16, 1908.

Plaintiff's yacht, on approaching a drawbridge and desiring to pass
    through, received a warning signal, whereupon plaintiff lay to in
    a safe place until another signal was given, interpreted by those
    on the boat as a signal to come on. The bridge had begun to
    open and continued to open, though slowly, until the collision
    which finally occurred. The boat was under sail, but the sail not
    drawing, and she was going with the tide, though it was inferable
    from the testimony that steerage way might have been gained at
    any time by trimming sheet. At one hundred and fifty or two
    hundred yards, according to the testimony, another signal was
    given from the bridge indicating the left span as the one to pass
    through. At about fifty feet from the bridge the tender called out
    that they must go back, and could not get through. It was then
    too late to avoid collision. *Held*, on these and the other circum-
    stances as testified to, that the existence of negligence on the part
    of the bridge-tenders, and of contributory negligence of the navi-
    gator of the boat were both questions for the jury, and that a
    nonsuit was error.

On error to the Supreme Court.

For the plaintiff in error, *Samuel W. Shinn* and *John W.
Wescott.*

For the defendant in error, *Gaskill & Gaskill.*

The opinion of the court was delivered by

PARKER, J. The plaintiff in error, who was plaintiff be-
low, was the owner of a sailing yacht, and sued the defend-

ant company for damages caused by collision of the said yacht with a swinging draw of the defendant's railroad bridge over Rancocas creek, in the county of Burlington. At the trial in the Supreme Court Circuit, motion was made to nonsuit the plaintiff on two grounds—*first,* because no negligence of defendant's servants in the management of the bridge had been shown; *secondly,* because of contributory negligence in the management of the boat. From the remarks of the court in disposing of the motion, we infer that the nonsuit which was entered was granted on the ground of contributory negligence. The case is here on writ of error to the judgment then entered, and if a nonsuit was justified on either ground it should stand.

Rancocas creek at the place in question, which is just at its mouth, is quite a wide stream, which might well be described as a river running east and west. On the north or right bank is the village of Delanco; opposite, on the south bank, Riverside. These two places are connected by a county bridge, east of which, at a distance of about four hundred yards or more, is the defendant's railroad bridge, running, as indicated by the official maps, nearly northeast and southwest, while the county bridge runs nearly north and south. By bearing these details in mind an apparent inconsistency in the testimony is fully explained, and the case will be more readily understood.

The accident occurred on May 25th, 1905, at about six-forty-five P. M., it being still light. Shortly prior to that time, plaintiff's boat, with plaintiff aboard, and having one Parker to navigate it, came up the Delaware river and entered the mouth of Rancocas creek on the way to Hainesport, near Mount Holly. There was a strong tide setting up the stream. The wind was light, and the boat, sailing free, passed through the draw of the wagon bridge. After going about one-third the distance to the other bridge, plaintiff and Parker, who was steering, saw the bridge-tender on the railroad bridge wave a red flag for them, and a white flag for an approaching train which was just leaving the Riverside station. Parker, accordingly, headed for the power-

house at Riverside and lay to in a position out of the tide about four hundred yards from the railroad bridge. They waited there, according to Parker's testimony, until "the train had gone on towards Delanco and they had started to turn the draw." The bridge-tender waved his white flag and shouted something which Parker and plaintiff could not make out because of the wind. Parker called out "We are coming through." The draw continued to turn, and presently he got under way, turning first, as he says, toward the wagon bridge, then let the boat pay off toward the boat houses on the Delanco side until it reached midstream; then he seems to have headed for the bridge and slacked off the sheet so that the sail should not draw, moving by the tide alone. It is not certain just what sail this was, as the testimony is vague as to the exact type of the boat. She is described in Parker's testimony as a "two-masted sloop, with a jib." Plaintiff says she was forty-two feet long and fourteen feet beam; so that she might have been a small schooner, or what is known as a yawl, having a mainmast forward and a smaller one at the stern. But only one sail was hoisted, "the forward sail," or inferably the foresail.

When within one hundred and fifty or two hundred yards of the railroad bridge, still in a place of safety so far as the case shows, the bridge turning all the while, but slowly, the bridge-tender, according to plaintiff's testimony, "waved his hand and showed them which side of the draw to take," indicating the northerly or Delanco end, which was to their left, and was swinging away from them. Parker's testimony as to what followed is as follows:

"*Q.* How near open was the draw then?

"*A.* The bridge was open very nearly far enough for the boat to go through; but they seemed to take so many turns around to make it open at all, seemed to open slowly. And when I got within fifty feet of the slip he hallooed for me, he says, 'You can't get through; you will have to turn.' Well, I couldn't. The tide was against me, the wind was against me, and I was simply there; and I held her just as close as I could to make her go through, thinking perhaps

she might, but the stay-ropes from the mast caught in the sleepers on the end of the draw as it was opening, and there was just about that much. space [indicating]. If it had been about that much further [indicating] it would have gone through. Of course that pulled the mast over, bent the mast clean over and broke the top of it off and, of course, opened her seams.

"*Q.* Then you were helpless, I suppose?

"*A.* Yes, sir; as soon as I seen I couldn't do no better I dropped the sail and took away everything and tried to stop it, but it was utterly impossible.

"*Q.* And the draw lacked about how much of being opened wide enough to let you through?

"*A.* If it had been opened two feet wider I could have gone through.

"*Q.* How many were working on the bridge when they were trying to turn it, did you see?

"*A.* I don't just recollect; three or four."

The colloquy between the court and plaintiff's counsel on the motion to nonsuit indicates the view of the trial judge as to the inferences to be drawn from the signals:

"The Court—The signal to the plaintiff in this case has been testified to have been four hundred yards away. At that time the draw of the bridge was not open.

"Mr. Wescott—Was being opened, it was testified to.

"The Court—Well, they had started to turn it according to the testimony. But it was obviously and palpably before the eyes of the plaintiff that the passageway was not then clear. He started the boat and undertook to go into what seems to be to the court an obvious danger which he himself ought to have seen. In addition I don't see that there can be any inference drawn from the defendant's. invitation to come through the draw, that the draw was then in a safe condition to pass, as the plaintiff's own eyes indicated that he clearly observed that it was not. A nonsuit will be entered."

The court seems to have overlooked the testimony of Anderson as to the proper channel being pointed out when they were one hundred and fifty yards away; and to have

taken the view that plaintiff was guilty of negligence in law by getting under way at all before the draw was sufficiently open to allow his boat to pass through, though plaintiff was entitled to infer that he was invited to come on.

We think the nonsuit was erroneous; that a case for the jury was presented, both on the question of the negligence of the servants of the railroad company and the contributory negligence, if any, of the plaintiff or his servant, Parker. The general rules in regard to the duties and liabilities of those in charge of drawbridges over navigable streams, and those passing through them, are stated in 29 *Cyc.* 316–318, with the authorities, which may advantageously be examined in some detail.

In *St. Louis, &c., Packet Co.* v. *Keokuk Bridge Co.,* 31 *Fed. Rep.* 755, the rule was laid down that a pilot navigating a stream over which a drawbridge is erected, is only obliged to use ordinary care and skill in passing through the draw, and the question under all the circumstances whether he did so is for the jury.

In *Clement* v. *Metropolitan West Side Elevated Railway Co.,* a case in the Circuit Court of Appeals, reported in 123 *Fed. Rep.* 271, a steamer two hundred and fifty-four feet long was navigating the Chicago river at night, and passed safely through a number of bridges, but on reaching the next bridge one hundred and thirty-five feet away, at a speed dead slow, it was seen that the bridge was not opening, so full speed astern was ordered, but without avail. It was held that the vessel was not in fault, and that the burden was on the defendant, owner of the bridge, to explain the failure to open it.

In *Central Railroad of New Jersey* v. *Pennsylvania Railroad,* 59 *Fed. Rep.* 192 (Circuit Court of Appeals), a tug with a tow in Newark bay whistled for the draw of the Central railroad bridge to open, receiving no reply, though the whistle was repeated several times. The tug and tow slowed up as much as possible to avoid collision, and the draw was held closed some minutes until a freight train was allowed to pass over. The draw then opened, but too late to

prevent collision of the tow with a pier of the bridge. The owner of the bridge was held liable on the ground that it owed the duty of reasonable care not only not to impede safe navigation, but to avoid unnecessary delay.

The case of *Manistee Lumber Co.* v. *Chicago,* 44 *Fed. Rep.* 87, presented a situation very similar to that in the case at bar. A schooner in tow of a tug was traversing the Chicago river. Whistle was blown to open a draw, and a bell was rung from the bridge to signify that it would be opened. This signal was intended to warn passengers on the bridge, but the court held that plaintiffs' servants were entitled to regard it as an intimation for their benefit. The drawtender found the locking mechanism out of order, and instead of signaling the tug at once to stop, began an investigation of the trouble and found out too late that he could not get the bridge open. The court expressly held that the tug was not in fault for not slacking speed as soon as it discovered that the draw was not swinging, and the city was therefore solely liable for the resulting collision.

*Boland* v. *Bridge Co.,* 94 *Fed. Rep.* 888, presents a case of a steamer descending the Missouri river sustaining other damage by trying to avoid collision with a drawbridge which was not opened. Navigation was evidently intermittent at the time, as the steamer people had sent word to the bridge-tender the night before to be ready for them. They had the draw in sight for two miles, and saw men on it, who, as it happened, were not the ones to open it. The steamer advanced on the bridge until it was evident that the draw was not going to open, and then tried too late to make shore, and ran into some obstruction and was damaged. In a suit against the bridge company the defence of contributory negligence was raised, and the court held that it was a reasonable supposition that the men in charge would commence to open the bridge in time, and that no negligence was chargeable to the navigators of the boat.

In *Chicago* v. *Mullen,* 116 *Fed. Rep.* 292, it was held to be negligence on the part of the bridge-tender to swing the draw

too far as a schooner in tow passed through, and that the latter was not bound to wait until the bridge was locked.

The case of *Edgerton* v. *Mayor*, *27 Fed. Rep.* 230, arose out of a collision in the Harlem river. Though it was held to be negligence in the pilot of a tug to approach the draw span at an angle, this course resulting in the collision, still it was held contributory negligence in the bridge-tender not to favor the passage of the tug by revolving the draw beyond the middle line, as was customary, and under the admiralty rule the damages were divided.

The general rule of conduct in such cases is very fully, and, we think, accurately, stated by Circuit Judge Jenkins, in *Clement* v. *Metropolitan Railway*, 123 *Fed. Rep.* 271, already cited. The following is the language of the opinion:

"A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft and maintained in suitable condition therefor. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible. It is also his duty to equip the bridge with proper lights giving warning of the position of the bridge and of its opening and closing. If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (*City of Chicago* v. *Mullen*, 116 *Fed. Rep.* 292), but may carefully proceed at slow speed

upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (*Manistee Lumber Co.* v. *City of Chicago (D. C.),* 44 *Fed. Rep.* 87; *Central Railroad Company of New Jersey* v. *Pennsylvania Railroad Co.,* 59 *Fed. Rep.* 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern."

Counsel have referred us to no case outside of this state, nor on an independent investigation do we find any, of collision between a sailing vessel under sail and a drawbridge, which throws any light on the matter in hand. It is worthy of remark that the two reported cases in this state on the general subject are of just this character.

In *Ripley* v. *Freeholders,* 11 *Vroom* 45, in the Supreme Court, the accident occurred at the draw of the county bridge over the Passaic at Bridge street, Newark, and was due to the failure of the freeholders to keep the bridge in repair, so that it sagged and worked so slowly that the draw-tender could not get it open in time. This failure was held to be negligence.

In the case of *Mattlage* v. *Freeholders,* 34 *Vroom* 583, decided by this court, the collision took place at the Paterson plank road bridge spanning the Hackensack river. In that case, as in this, the vessel was sailing free and the tide running in her favor three miles an hour. The wind was fresh. The mate blew a horn as a signal, and the crew took in the foresail and lowered the mainsail to the third reef, dropped the peak and hauled in the boom. The schooner was then under jib and close reefed mainsail, practically all her sail being the jib, and this necessarily making it impossible in case of emergency to bring her up into the wind. At six hundred yards the bridge-tenders were seen working on the draw as if to open it; at two hundred feet the bridge-tender waved his hat, but it was then too late, for the heavily-laden schooner, moving six miles an hour, under headsail almost entirely, could not put about or anchor, and an accident was inevitable. It turned out that the bridge was jammed by

the expansion of the trolley rails with the heat. It was held that from this condition, which had persisted for some time, the jury was entitled to infer negligence of the freeholders in failing to use proper care in keeping the bridge in repair. It was also argued, but unsuccessfully, that contributory negligence had been conclusively established by comparison of the alleged time that was usually required for the bridge to open, and the speed of the schooner, as indicating that the latter was still in a place of entire safety when it became evident that the bridge was not to be open in time. Other testimony inconsistent with this was held to raise a jury question.

There is no testimony in the case at bar, however, that indicates the time usually required to open the bridge in question, so that a discussion of contributory negligence from that point of view is unnecessary.

From the testimony that on coming through the wagon bridge and heading for the draw of the railroad bridge, signal was made with a red flag to the boat and a white flag to an approaching train, and that plaintiff changed his course and lay to until the train had passed and a white flag was then waved and the draw began to open, when he again headed for the draw and was allowed without signal to approach within one hundred and fifty or two hundred yards; that the draw continued to open all that time, and that at that point the particular course of the plaintiff was indicated to him from the bridge and no objection made to his proceeding further until within some fifty feet of the bridge, we think it was clearly inferable by a jury that the bridge-tenders were aware of plaintiff's intention, invited him to come on and gave him to understand that the draw would be open for him; that their failure to open it in time was due either to a miscalculation of the time required to open it, of which they were the sole judges, or of the force of the tide, of which they could judge as well as plaintiff, or both; and that from their conduct either in inviting the plaintiff too soon, or not warning him back till too late, or tardiness in opening the draw, negligence on their part was a legitimate inference.

The duty of railroad companies to maintain and operate drawbridges on navigable streams and provide bridge-tenders thereon, and to open the draws for free passage of vessels, is declared by statute. *Pamph. L.* 1903, *p.* 655, §§ 16; 17.

As to the conduct of the plaintiff himself, the question of his negligence was as clearly a jury question. If the tide was running three miles an hour and he had four hundred yards to go, it would take him at that speed, not using his sail, four and one-half minutes to reach the draw—apparently ample time for any ordinary draw to open. At a distance of one hundred and fifty yards he was still a minute and three-quarters away. The court cannot undertake to fix as a matter of law a limit within his zone of safety at which, in the absence of a signal from the draw, he should have realized that it would not open in time. Nor can it be said that he was negligent as a matter of law in passing out of the area of safety before the bridge was open or it was absolutely certain that it would be. Vessels are constantly advancing upon bridges, as the reported cases show, and as every-day experience tells us, without waiting for them to open; and on the proper and legal assumption that the tenders will do their duty and give the vessel the right of way to which it is entitled. On this point the remarks of Judge Jenkins, already quoted, are most pertinent.

Nor can it be said, as a matter of law, that Parker was negligent in losing control of the boat. As we read the testimony, the wind was not dead aft as they entered Rancocas creek, but slightly quartering from the south. At least this inference is permissible. After passing the first draw they came to off Riverside, under the shore. In getting under way again, they started off toward the west, which would be on the port tack, and in turning up the river either went about or gybed, and with the slight change of course required by the different angle of the railroad bridge must have had the wind nearly or quite abeam. This explains the testimony that Parker slacked off the sheet to let the wind out of the sail. The situation was then such that the boat would instantly gather steerage way by merely trimming the sail, so

that it would fill, and up to within a comparatively short distance of the bridge, might be put about and saved from collision. So far as the tide and other circumstances were concerned, the situation was not of Parker's making. He had to take them as he found them, and do the best he could.

If, as the United States courts hold, and we think is the law, he was entitled to assume in the first instance that the bridge would be opened in time; and a jury might fairly find, as we think they might have found, that he proceeded on that assumption, carefully, at a slow speed and received no warning signal, and it did not appear in reasonable view of the situation that the bridge would not be opened until too late to turn back, he cannot be held guilty of contributory negligence. All these matters of fact a jury might, on the evidence, have found in his favor.

The first section of the Bridge act of 1833, as amended in 1894 (*Gen. Stat.,* p. 313, *pl.* 41; p. 314, *pl.* 47), imposing a penalty on commanders of vessels for failure to lower their sails on approaching drawbridges, which was discussed in *Ripley* v. *Freeholders, ubi supra,* was not adverted to in the court below nor mentioned in the briefs of counsel in this court, so, perhaps, it needs no notice here. It may as well be said, however, that the "lowering of the sails" required was held by the Supreme Court in the Ripley case to be such as in the language of the statute would "enable the vessel to pass gently through." We see no reason for questioning at this time the propriety of that decision; and if, as was testified in this case, the sail had no effect on the speed of the boat, it was immaterial whether it was raised or lowered, and no negligence could be predicated on a failure to lower it, especially in view of the defendant railroad's claim that, in effect, it was negligence not to keep the sail full.

We conclude, therefore, that both defendant's negligence and plaintiff's contributory negligence were questions for the jury, and that the nonsuit was wrong. The judgment of the Supreme Court will therefore be reversed and a *venire de novo* awarded.

*For affirmance*—The Chief Justice, Reed, Voorhees, Minturn, Vredenburgh, Gray, Dill, J.J.   7.

*For reversal*—The Chancellor, Garrison, Swayze, Trenchard, Parker, Bergen, Bogert, Vroom, Green, J.J.   9.